*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTONIO VALDEZ,

        Defendant-Appellant.

UNPUBLISHED
September 09, 2025
9:48 AM

No. 368473
Oakland Circuit Court
LC No. 2021-276517-FC

Before: ACKERMAN, P.J., and M. J. KELLY and O'BRIEN, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84, and carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1).[1] Defendant raises a number of ineffective-assistance-of-counsel claims on appeal, but does not allege that he was prejudiced by any one of his trial counsel's supposed errors—he instead argues that the cumulative effect of all of his trial counsel's errors prejudiced him. We conclude that none of defendant's claims of ineffective assistance have merit, either individually or collectively, so we affirm.

## I. BACKGROUND

Defendant's convictions arise out of the shooting of FQ. Before the shooting, FQ lived with defendant, and they had a sexual relationship. According to FQ, defendant wanted them to be "boyfriend and girlfriend," but FQ considered defendant her "sugar daddy"—he gave FQ money and provided her with transportation and drugs. In early 2020, FQ began dating another man. When defendant found out, he "became more controlling" and abusive, according to FQ. As a result, FQ began leaving defendant's home for weeks at a time.

---

[1] Defendant was charged with assault with intent to commit murder, MCL 750.83, but the jury convicted him of the lesser included charge of AWIGBH.

-1-

On July 25, 2020, defendant messaged FQ to come home, offering to purchase drugs for her. At about 12:00 a.m. on July 26, 2020, FQ met defendant at his home, arranging to purchase heroin and crack cocaine. FQ said that, when she arrived, she "could tell" defendant had been drinking. FQ and defendant drove in defendant's van together to a house to buy the drugs, and FQ went inside to make the purchase. Defendant became impatient waiting for FQ to finish and, according to FQ, "started laying on his horn." FQ estimated that she completed the purchase and returned to the van within 15 minutes. But by the time she got back to the van, defendant was, in FQ's telling, "irate" and accused her of "doing something with" her dealer.

FQ testified that defendant drove away erratically, so she asked defendant to pull over and let her drive. Defendant obliged, and he and FQ traded spots. With FQ now behind the wheel, defendant, according to FQ, "took out his gun from his waistband and . . . threw it at the windshield and he cracked it." In response to defendant's continued erratic behavior, FQ told him that she was going to pull over and walk home, in response to which defendant told her to "[k]eep driving or he would kill [her]."

Though scared, FQ continued driving until she heard a gunshot. FQ said that she did not see defendant fire a gun but believed he shot out the open van window. At that point, FQ pulled over, which was when, according to FQ, defendant shot her in the back. FQ ran through a nearby parking lot toward some trees in an attempt to hide, but had to stop running because she was having trouble breathing. FQ was eventually taken to a nearby hospital with life-threatening injuries. She told her boyfriend and the responding officers that defendant shot her.

Defendant was arrested outside his home. While officers did not find the gun in defendant's van or house, they found a bullet casing on the floor behind the driver's seat of defendant's van and a bullet hole in the cracked passenger side window. Defendant was interviewed by Oakland County Sheriff's Department Detective Michael Miller at the police station at about 2:30 a.m. Defendant told Detective Miller that he and FQ were in the van when another man attempted to rob defendant at gunpoint. According to defendant, a struggle ensued between him and the man, and the gun went off and hit FQ. Defendant told Detective Miller that, afterwards, he could not find FQ and assumed that she went to the hospital. The location where defendant told Detective Miller that this occurred did not make sense to the detective due to how far away it was from where FQ was found.

Defendant's initial account of events to Detective Miller was also contradicted by a surveillance video that the detective obtained, which was admitted as evidence at defendant's trial. The video depicted the street where FQ was found at about 1:00 a.m. on July 26, 2020, and showed FQ getting out of a van and running toward a parking lot. After the van drives off, FQ can be seen returning to the street and walking along the sidewalk before collapsing.

After the prosecution rested, defendant called Terry Dunn. Dunn testified that on July 25, 2020, she picked defendant up at about 11:00 a.m. and took him to a family cookout. Dunn eventually drove defendant home sometime between 10:30 p.m. and 11:00 p.m., at which time he was drunk and needed to be helped into her vehicle. Defendant's trial counsel asked Dunn if she heard from defendant later in the night and if he still sounded drunk, and Dunn confirmed that she had and he did.

Defendant also testified on his own behalf, and gave a more detailed version of the events that he told Detective Miller. Defendant said that when he met FQ, "she was a hooker." Defendant also confirmed Dunn's testimony—he said that, on July 25, 2020, Dunn picked him up, he drank all day, and then Dunn dropped him off at the end of the night. According to defendant, almost immediately after Dunn dropped him off, FQ arrived and asked defendant for money. Defendant said that he pulled out his wallet containing $800, and gave FQ $100. He and FQ then prepared to leave so that FQ could buy drugs, but before they left, defendant took most of the money out of his wallet so he only "had, like, 80 some dollars in [his] wallet."

FQ then drove with defendant to a house and went inside to buy drugs. Defendant said that, after waiting for over 15 minutes, he began honking the horn. When FQ still did not come out after several more minutes, defendant "just laid" on the horn. FQ then, according to defendant, came out and opened the driver's side door, yelling at defendant for honking the horn, at which point a man grabbed defendant from behind, put a gun to his head, and demanded money. Defendant refused, so the man shot the windshield. Defendant said that the man then "put [his] hand down," so defendant "reached for the hand, and [the man] struck" defendant, causing the gun to go off "towards the driver's side toward where [FQ was] at." The man then, according to defendant, ran away, and FQ began screaming. Defendant said that he "peed [his] pants when [the man] put the gun in [defendant's] face."

When defendant heard FQ screaming, he tried to get her to come with him, but she refused and told him to leave. Defendant insisted that he needed to take FQ to the hospital, but FQ continued telling defendant to leave. So, defendant got in his van and drove away, but decided to go back and pick up FQ. According to defendant, this time, FQ came with him, but insisted that he allow her to drive because defendant was "going crazy trying to get to the hospital." While she was driving, defendant insisted that she was going the wrong way, so he grabbed the wheel, in response to which FQ stopped the car and walked off. Defendant then got in the driver's seat and tried to get her back in the car, but she told him to leave, so he did.

Defendant explained that he told this story to Detective Miller, but he was "very intoxicated" during his interview. Defendant denied shooting FQ and denied owning a gun, stating that the gun belonged to FQ.

The jury convicted defendant as stated above. This appeal followed.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

On appeal, plaintiff raises several claims of ineffective assistance of counsel. Whether a defendant was denied the effective assistance of counsel generally presents a mixed question of fact and law—any factual findings the trial court made to support its decision are reviewed for clear error, while the trial court's ruling on whether the defendant's right to the effective assistance of counsel was violated is reviewed do novo. *People v Haynes*, 338 Mich App 392, 429; 980 NW2d 66 (2021). Where, as here, no evidentiary hearing was held on the defendant's ineffective-assistance claim, "there are no factual findings to which this Court must defer, and this Court's review is instead limited to errors apparent on the record." *Id.*

To be entitled to relief on an ineffective-assistance claim, defendant must satisfy the well-known two-part test: first, defendant must establish that his trial "counsel's performance fell below an objective standard of reasonableness," and second, he must show that, but for his "counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012).

To show that trial counsel's performance fell below an objective standard of reasonableness, "a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Douglas*, 496 Mich 557, 585; 852 NW2d 587 (2014). "If this Court can conceive of a legitimate strategic reason for trial counsel's act or omission, this Court cannot conclude that the act or omission fell below an objective standard of reasonableness." *Haynes*, 338 Mich App at 429-430. But any strategy so conceived must be in fact "sound, and counsel's decisions as to it objectively reasonable." *Douglas*, 496 Mich at 585.

The defendant bears the burden of proving an ineffective-assistance claim. See *Haynes*, 338 Mich App at 429. As part of carrying this burden, the defendant must establish the existence of the facts on which he relies in support of his claim. See *id*. at 430. Stated differently, "[t]he defendant has the burden of establishing the factual predicate of his ineffective assistance claim." *Douglas*, 496 Mich at 592.

### III. PRIOR CONVICTIONS

Defendant first argues that his trial counsel provided ineffective assistance when he asked defendant about his previous convictions during the following exchange on direct:

*Q*. You have prior convictions, correct?

*A*. I do.

*Q*. What are they?

*A*. When I was 18, I confessed to it, to a sexual assault.

*Q*. Okay, and where was that at?

*A*. In Arizona, it's on Arizona.

*Q*. Do you have any other convictions?

*A*. I have an aggravated assault out of Arizona.

*Q*. And when was that?

*A*. 1987.

*Q*. Okay. Since then, you've had no other convictions?

*A*. No, sir.

Defendant contends that this line of questioning was objectively unreasonable because evidence about defendant's prior convictions would not have been otherwise admissible.

We are inclined to agree with the prosecution that this did not amount to ineffective assistance. Generally speaking, decisions about what evidence to present is a matter of trial strategy, "and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). It is conceivable, as the prosecution notes, that defendant's trial counsel elicited this evidence as part of a strategy to bolster defendant's credibility with the jury—defendant's willingness to admit to past crimes that he had committed potentially made his denial of the crime with which he was charged more believable. That is especially so because defendant's past crimes were over 33 years old, and defendant had no other convictions since then, suggesting that the crimes were youthful indiscretions.

Our conclusion that this line of questioning can constitute legitimate trial strategy is bolstered by our Supreme Court's opinion in *People v Parker*, 417 Mich 556; 339 NW2d 455 (1983). There, like here, the defendant's trial counsel asked the defendant about his past conviction on direct examination, and the defendant testified about his conviction on the stand. *Id*. at 567. On appeal, the defendant argued that his trial counsel's line of questioning amounted to ineffective assistance, but our Supreme Court was not persuaded, saying, "While we are not inclined to recommend this strategy on retrial, we are not prepared to hold it amounted to ineffective assistance of counsel." *Id*. Trial counsel "is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases," *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008), and a strategy is not unreasonable "simply because it did not work," *People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004). With these principles in mind, we reach the same result as our Supreme Court did in *Parker*—while we do not recommend defendant's trial counsel's strategy, we conclude that it did not amount to ineffective assistance. See *Parker*, 417 Mich at 567.

## IV. DEFENDANT'S MESSAGE ON DUNN'S VOICEMAIL

Defendant next argues that his trial counsel provided ineffective assistance when he elicited damaging testimony from Dunn about a voicemail that defendant left her on the night of the shooting. The testimony occurred in the following exchange, which took place after Dunn confirmed that defendant was intoxicated after she dropped him off at his home:

> *Q*. Okay. Did you hear from [defendant]—when was the next time you heard from him?
>
> *A*. I didn't hear from him. I received a phone call, like, one something in the morning, but I was asleep. I didn't answer it. Then the phone rang again—I guess—a few minutes later or a minute later and left me a message, said that they got me. I think I'm going to jail. It's just all blurred. I couldn't understand it. I couldn't even understand the message. From what I get—that's what I took out of it, but I don't—honestly don't recall what it exactly said because he was—I still think—intoxicated pretty bad, so—

-5-

*Q.* Okay, you thought he was under the influence based upon your experience with him—

*A.* Yes—yeah, of beer, of alcohol, yes, of alcohol.

*Q.* All right, and that would be—okay.

*A.* I don't know if he went back home when I dropped him off and he started more beer, I don't know.

*Q.* You don't know, no.

*A.* Right, I don't know that. I cannot say that. But when—

*Q.* But when you got the message, you believed that he was still intoxicated.

*A.* Oh, yeah, yes, yeah, I could tell by the—by—by his voice, the words that he was intoxicated.

Defendant contends that his trial counsel's questioning of Dunn was objectively unreasonable because it elicited testimony from Dunn that defendant was drunk on the night of the shooting and left her a voicemail saying, "I think I'm going to jail."

To the extent that Dunn testified that defendant was drunk on the night of the shooting, that fact was already in evidence. The prosecution had admitted (1) messages that defendant sent on the day of the shooting saying that he had been drinking, (2) FQ's statement to the police that defendant had been drinking on the day of the shooting, and (3) FQ's trial testimony that defendant had been drinking before the shooting. So, Dunn's testimony that defendant had been drinking was cumulative of other evidence already before the jury.[2]

That aside, we agree with the prosecution that there was likely a strategic reason for eliciting testimony that defendant was drunk at the time of the shooting—he was interviewed by Detective Miller shortly after the shooting, and his trial testimony differed substantially from the statement that defendant provided to the detective. Defendant's trial counsel could have thus made the strategic decision to emphasize defendant's drinking on the day of the shooting to explain why his trial testimony differed from the statement he gave to the detective. This strategy prompted the prosecutor to argue during closing that, while defendant may have been drunk when he was interviewed by Detective Miller, he was not drunk enough to leave out the important details that he added to his version of events during his trial testimony. And, as the prosecution on appeal notes, defendant being drunk on the night of the shooting would help explain why he would allow FQ to drive *after* she had been shot, as he testified at trial. For all these reasons, it was not

---

[2] Defendant also testified at trial that he drank throughout the day before the shooting and was intoxicated by the end of the night.

objectively unreasonable for defendant's trial counsel to elicit testimony from Dunn that defendant was intoxicated on the night of the shooting.

As for Dunn's testimony about the voicemail that defendant left her, that testimony was clearly nonresponsive to the question that defendant's trial counsel asked. Defendant's trial counsel asked "when was the next time you heard from" defendant, to which Dunn testified about the content of a message that defendant left her on the night of the shooting. True, defendant's trial counsel could have objected to Dunn's testimony as nonresponsive, but, as the prosecution observes, this would have only highlighted the statement for the jury. "Certainly there are times when it is better not to object and draw attention to an improper comment," *People v Bahoda*, 448 Mich 261, 287 n 54; 531 NW2d 659 (1995), and we agree with the prosecution that it was not unreasonable for defendant's trial counsel to conclude that this was one of those times. In other words, it was objectively reasonable for defendant's trial counsel to allow Dunn's nonresponsive answer to his question to stand rather than objecting to the damaging testimony and drawing the jury's attention to it.[3] And because defendant's trial counsel was not omniscient, he could not have predicted that Dunn would have provided a nonresponsive answer to his question, so the fact that he elicited the testimony about the message that defendant left in Dunn's voicemail does not, by itself, support that counsel's performance was objectively unreasonable.[4]

## V. DETECTIVE MILLER'S STATEMENTS

Defendant next takes issue with his trial counsel's failure to object to two statements that the jury heard from Detective Miller. First, defendant takes issue with a statement that the jury heard Detective Miller make in his interview of defendant, in which the detective repeatedly told defendant that his version of events did not make sense. Second, defendant takes issue with Detective Miller's trial testimony in which he said that the statement that defendant gave the detective was inconsistent with the surveillance video that the jury saw. Defendant contends that these statements were improper because they amounted to Detective Miller commenting on defendant's credibility.

It is well-established that a witness is not permitted "to comment or provide an opinion on the credibility of another witness, because credibility matters are to be determined by the jury." *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007). It is also well-established that a witness cannot comment on a defendant's guilt. *People v Hawkins*, 507 Mich 949, 949 (2021).

---

[3] Defendant emphasizes on appeal that the prosecution seized on Dunn's damaging testimony, but the reasonableness of counsel's decision to not object to the testimony in the moment cannot be judged with the benefit of hindsight. See *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999).

[4] It is also apparent from defendant's trial counsel's continuing questions of Dunn that he was attempting to elicit Dunn's testimony that defendant was still intoxicated when she heard from him later that night. This, again, was likely part of trial counsel's strategy to establish that defendant was intoxicated when Detective Miller interviewed him, which in turn could explain why defendant's statement to the detective was different from his trial testimony.

This latter rule is particularly important for testifying police officers, like Detective Miller, because their statements may be given undue weight by the jury. See *People v Musser*, 494 Mich 337, 358; 835 NW2d 319 (2013). But neither of these rules bars police officers from testifying about personal perceptions made during an investigation, including about whether a defendant appeared to be truthful. See *People v Heft*, 299 Mich App 69, 82-83; 829 NW2d 266 (2012). Such testimony is admissible as lay-witness testimony under MRE 701.[5] See *Heft*, 299 Mich App at 83. See also *People v Lowrey*, 342 Mich App 99, 112; 993 NW2d 62 (2022).

Neither of Detective Miller's statements that defendant takes issue with amounted to comments on defendant's credibility or guilt, and both statements were instead admissible personal perceptions that Detective Miller made during his investigation. As Detective Miller explained at defendant's trial, his statements in the interview about the believability of defendant's story were based on the detective's knowledge about the geography of the locations where defendant said FQ left him on foot and where she was found. The statements were thus clearly the detective's personal perceptions about defendant's story made during his investigation. As for Detective Miller's testimony at defendant's trial that defendant's statement to the detective was inconsistent with the surveillance video that the jury saw, that statement too was clearly permissible lay-witness testimony based on the detective's personal perceptions. Defendant's trial counsel cannot be found ineffective for failing to make futile objections to Detective Miller's permissible statements. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## VI. CLAIMS LACKING FACTUAL PREDICATES

Defendant raises a number of other ineffective-assistance claims on appeal, but he fails to establish the factual predicates of any of them.

First, defendant argues that his trial counsel provided ineffective assistance because he failed to corroborate defendant's statement to Detective Miller during their interview that FQ had pending warrants, which was the reason that defendant gave the detective for not calling the police after FQ was shot. In support of his assertion that FQ had outstanding warrants, defendant directs this Court's attention to several attachments to his brief. But defendant did not file any attachments with his brief. This Court is therefore left with no evidence that FQ actually had any outstanding warrants. We accordingly must reject defendant's ineffective-assistance claim premised on FQ's outstanding warrants because defendant has failed to establish the factual basis of this claim. See *Douglas*, 496 Mich at 592.

Second, defendant contends that his trial counsel provided ineffective assistance because he never corroborated defendant's testimony that he urinated himself on the night of the shooting. In support of this argument, defendant directs this Court's attention to a dashcam video of

---

[5] At the time of defendant's trial, MRE 701 provided:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

defendant's arrest, in which an officer supposedly confirms that defendant urinated himself. Defendant says that this dashcam video is included in the appendix to his brief. But defendant did not include an appendix to his brief on appeal. There is thus no evidence before this Court that corroborates defendant's statement that he urinated himself on the night of the shooting, and defendant has failed to establish the factual basis for his ineffective-assistance claim premised on such evidence. See *id*.

Third, defendant argues that his counsel provided ineffective assistance when he failed to cross examine FQ and Detective Miller about FQ allegedly giving a false phone number to the police after the shooting. But nothing in the record actually establishes that FQ gave the police a false phone number, and defendant does not offer any proof supporting his claim to the contrary. Defendant has therefore, once again, failed to establish the factual predicate of his claim.[6] See *id*.

Lastly, defendant contends that his trial counsel provided constitutionally ineffective assistance of counsel when he failed to ask about a number of arrest charges against FQ that were either dismissed or favorably adjudicated before defendant's trial. But, yet again, defendant has not provided this Court with any documents confirming what he alleges. Therefore, as with all of defendant's arguments addressed in this section of the opinion, defendant has failed to establish the factual predicate of this ineffective-assistance claim. See *id*.[7]

Affirmed.

/s/ Matthew S. Ackerman
/s/ Michael J. Kelly
/s/ Colleen A. O'Brien

---

[6] Even accepting as true that FQ gave police a false phone number, we do not understand defendant's argument as to why it was objectively unreasonable for defendant's trial counsel to not ask about it. Defendant claims that FQ's giving a false phone number "indicates that [FQ] had something to hide or was lying about something substantially more important than her phone number." But this assertion is hardly a logical inference from the fact that FQ did not give police the right phone number. Which questions to ask witnesses are presumed matters of trial strategy, *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002), and all that defendant's argument has established is that defendant's trial counsel could have asked FQ and Detective Miller a question—he has not established that it was objectively unreasonable for counsel not to do so.

[7] Defendant argues that the cumulative effect of all of the errors he identified on appeal prejudiced him. For the reasons explained throughout this opinion, however, we conclude that defendant has not identified any errors in his trial counsel's performance. "Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal." *Dobek*, 274 Mich App at 106.